NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4277

THE STATE OF OHIO, APPELLEE, *v*. SCOTT, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Scott*, Slip Opinion No. 2022-Ohio-4277.]**

*Criminal law—Postconviction DNA testing—R.C. 2953.74(C)(4) and (5)—R.C. 2953.74(D)—The possibility that an offender's postconviction DNA test results could match the profile of a person other than the offender in the Combined DNA Index System database is not "available admissible evidence" that a trial court must consider under R.C. 2953.74(D) when deciding whether to grant an offender's application for postconviction DNA testing—The trial court and the court of appeals abused their discretion in unreasonably concluding that postconviction DNA test results would not be outcome determinative, because a presumed exclusion result when viewed in the context of the circumstantial evidence of the case presents a strong probability that a reasonable factfinder would not have found the offender guilty of the offense for which he was convicted—Judgment reversed and*

*cause remanded to the trial court to approve application for postconviction DNA testing.*

(No. 2020-1583—Submitted December 8, 2021—Decided December 2, 2022.)

APPEAL from the Court of Appeals for Butler County, No. CA2020-01-007, 2020-Ohio-5302.

_____

**O'CONNOR, C.J.**

{¶ 1} Appellant, Guy Billy Lee Scott, is serving a prison term of 15 years to life for his 1992 convictions for the assault, rape, and murder of Lesa Buckley. Scott petitioned the Butler County Court of Common Pleas for postconviction DNA testing, which appellee, the state of Ohio, opposed. The trial court denied the petition, and the Twelfth District Court of Appeals affirmed the trial court's judgment. In this appeal, we determine whether the postconviction DNA testing that Scott seeks is outcome determinative as required by R.C. 2953.74(C)(4) and (5). Because we find that it is, we reverse the court of appeals' judgment and remand this cause to the trial court for further proceedings.

**Background**

{¶ 2} Following a jury trial in 1992, Scott was convicted of the assault, rape, and murder of Buckley. Buckley's body was found on July 8, 1990, in Cedar Lake near New Paris, Ohio. The lake was in a disused gravel quarry where Buckley and Scott, along with 60 to 120 other people, attended a party the previous night.

{¶ 3} A summary of the testimony from Scott's trial may be found in the Twelfth District's decision affirming his convictions. *State v. Scott*, 12th Dist. Butler No. CA92-03-052, 1994 WL 394976 (Aug. 1, 1994). This court declined review of Scott's direct appeal. *State v. Scott*, 71 Ohio St.3d 1428, 642 N.E.2d 635 (1994).

{¶ 4} In 2019, Scott petitioned the trial court under R.C. 2953.73 for postconviction DNA testing. The trial court denied the application, concluding that

it did not satisfy the "outcome determinative" standard set forth in R.C. 2953.74(D). The Twelfth District affirmed the trial court's judgment. 2020-Ohio-5302, ¶ 52, 59.

{¶ 5} We accepted jurisdiction over Scott's discretionary appeal and his single proposition of law in which he asserts that a trial court should consider the possibility that a DNA profile developed from crime-scene evidence could match a profile contained in the Combined DNA Index System ("CODIS") database when considering whether to grant an application for postconviction DNA testing. *See* 161 Ohio St.3d 1474, 2021-Ohio-717, 164 N.E.3d 482.

**Analysis**

{¶ 6} Ohio law provides eligible offenders the opportunity to apply for postconviction DNA testing as described in R.C. 2953.71 through 2953.81. *See* R.C. 2953.73. The circumstances under which a trial court may accept an application for postconviction DNA testing are described in R.C. 2953.74. When Scott was tried for the assault, rape, and murder of Buckley in the early 1990s, DNA testing was not conducted on the biological samples obtained from Buckley. Consequently, Scott's application for postconviction DNA testing falls under R.C. 2953.74(B)(1), which provides that the court may accept the application only if

> [t]he offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of [R.C. 2953.74] would have been outcome determinative at that trial stage in that case, and, at the time

of the trial stage in that case, DNA testing was * * * not yet available.

R.C. 2953.74(C) describes additional conditions the offender must satisfy before the trial court may accept the offender's application for postconviction DNA testing. Relevant here is the requirement that an exclusion result would be outcome determinative regarding the offender. *See* R.C. 2953.74(C)(4) and (5).

{¶ 7} An "exclusion result" is a DNA test result "that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question." R.C. 2953.71(G). "Outcome determinative" means that "there is a strong probability that no reasonable factfinder would have found the offender guilty of [the] offense" for which he or she was convicted if the DNA results had been presented and found relevant and admissible at trial and "had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case." R.C. 2953.71(L). The statute that sets forth the grounds for accepting an application for postconviction DNA testing makes clear that "the court, in determining whether the 'outcome determinative' criterion described in divisions (B)(1) and (2) of [R.C. 2953.74] has been satisfied, shall consider all available admissible evidence related to the subject offender's case." R.C. 2953.74(D).

### *Whether the trial court should consider the possibility that a comparison of postconviction DNA test results with CODIS will identify a person other than the offender as "available admissible evidence" when considering an application for postconviction DNA testing*

{¶ 8} Scott argues that when the trial court was considering whether postconviction DNA testing in his case was "outcome determinative," it should have considered the possibility that the test results could match another person's

4

profile in CODIS. R.C. 2953.74(E) provides that if the court accepts an application for DNA testing,

> the eligible offender may request the court to order, or the court on its own initiative may order, the bureau of criminal identification and investigation to compare the results of DNA testing of biological material from an unidentified person other than the offender that was obtained from the crime scene or from a victim of the offense for which the offender has been approved for DNA testing to the combined DNA index system maintained by the federal bureau of investigation.

If there is a match in the database, "[t]he offender or the state may use [that] information for any lawful purpose." *Id.*

{¶ 9} R.C. 2953.74(E) clearly provides that a CODIS search may be ordered *if* a trial court accepts an application for DNA testing. But we are not persuaded that the court must consider the *possibility* of postconviction DNA test results returning a CODIS match that identifies someone other than the petitioner as "available admissible evidence" when determining whether to accept an application for testing. To put it quite simply, a petitioner first needs a DNA test and its result before a CODIS search can be performed.[1] And the court must first accept an

---

1. That a court may order a comparison of a DNA test result with CODIS as described in R.C. 2953.74(E) makes good investigative sense. If an exclusion result is obtained, the state would surely be motivated to identify possible alternative suspects in order to protect the public. *See* Brief of Amicus Curiae, Ohio Prosecuting Attorneys Association, in Support of Plaintiff-Appellee the State of Ohio at 5, Supreme Court case No. 2020-1583 (July 21, 2021) ("If the crime scene DNA does not match the convicted defendant's DNA, then a CODIS search would absolutely be appropriate"). In fact, we know that "in some cases, merely being excluded from a crime scene is insufficient to convince a court that the requested postconviction relief is warranted," *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, ¶ 37 (8th Dist.), and that identifying the actual perpetrators may be the only avenue for relief, *id.* at ¶ 38-39 (summarizing the eventual exonerations of the offenders). A CODIS search using a DNA test result is a valuable investigative tool, and

application for DNA testing before ordering a CODIS search. Thus, it is impossible for a CODIS match to be *available* evidence when the trial court is considering a petitioner's application for testing.

**{¶ 10}** Additionally, a court's decision to accept an application for postconviction DNA testing or to order a comparison of DNA test results with CODIS is within the court's discretion. *See* R.C. 2953.74(B) (the court "may accept the application only if" one of the enumerated conditions applies); R.C. 2953.74(C) (the court "may accept the application only if" all of the enumerated conditions apply); R.C. 2953.74(E) (the court "may order" a CODIS search using the DNA test results). That discretion is to be exercised on a case-by-case basis, based on the unique facts of each case. *See State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, ¶ 43 (8th Dist.). It would be illogical to presume that for every case a CODIS match would be necessary or relevant in every application for postconviction DNA testing. Therefore, we reject any invitation to create a bright-line rule that every offender who submits an application for postconviction DNA testing is entitled to a presumption that his or her test result will return a CODIS match identifying someone other than the petitioner.

**{¶ 11}** Nonetheless, the statutory scheme requires the trial court reviewing an application for postconviction DNA testing to presume that an "exclusion result"—that is, a result that "scientifically precludes or forecloses" the offender as a contributor, R.C. 2953.71(G)—will be obtained by the offender. R.C. 2953.74(C)(4). With that presumed result in mind, the trial court must determine whether such a result would be outcome determinative for the offender. R.C. 2953.74(C)(5). To determine whether postconviction DNA testing would be outcome determinative, the presumed exclusion result must be analyzed in the context of and upon consideration of "all available admissible evidence related to

---

nothing about our conclusion regarding the presumption of a possible CODIS match should be read as limiting the employment of this important tool.

the subject offender's case." R.C. 2953.74(D). Given that the trial court must presume that postconviction DNA testing may exclude the offender as a contributor, the existence of evidence that also supports a defense theory involving an alternative suspect who could be the contributor is highly relevant to the outcome-determinative standard that a court must consider when determining whether to grant the application for testing. *See, e.g.*, *State v. Gavin*, 2022-Ohio-3027, 195 N.E.3d 226, ¶ 42 (4th Dist.) ("After considering all available admissible evidence related to [the offender's] case, we agree with [the offender's] argument that if his DNA were to be absent from the plastic bag at issue, and if the DNA of either [of the alternative suspects] is present on the bag, there is a strong probability that no reasonable factfinder would have found [the offender] guilty of the offenses at issue and thus, such results would be outcome determinative"); *State v. Reynolds*, 186 Ohio App.3d 1, 2009-Ohio-5532, 926 N.E.2d 315, ¶ 10 (2d Dist.) ("Because it is undisputed that no physical evidence was found at the scene which linked [the offender] to the crimes, DNA test results implicating a third party as the source of the biological material would be outcome determinative, and thus, we hold that the trial court abused its discretion when it rejected [the offender's] application"). Here, the record is devoid of any physical evidence linking Scott to the crimes, Scott's defense theory involved one or more alternative suspects, and the identity of the contributor to the DNA samples taken from Buckley is unknown. Accordingly, we review the lower courts' application of the outcome-determinative standard to the facts of this case.

***Whether a postconviction DNA test result excluding Scott would be outcome determinative***

{¶ 12} We review a lower court's decision whether postconviction DNA testing would be outcome determinative for an abuse of discretion. *See State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124, paragraph one of

the syllabus; *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E2d 905, ¶ 45.

{¶ 13} Here, the Twelfth District concluded that the trial court did not act unreasonably, arbitrarily, or unconscionably in finding that a DNA exclusion result would not be outcome determinative:

> This is not a case where the margin of evidence was so narrow that a DNA exclusion result would lead to a strong probability that no reasonable factfinder would have found Scott guilty. This is also not a case where Scott's conviction was premised on one or a few pieces of suspect evidence, or a single eyewitness's questionable identification. The jurors considered the testimony of dozens of witnesses and numerous pieces of circumstantial evidence that, when fit together, led them to the conclusion, beyond a reasonable doubt, that Scott assaulted, raped, and murdered Buckley.

2020-Ohio-5302 at ¶ 52.

{¶ 14} Taking the court of appeals' description of the evidence at face value, it is easy to assume that the jury's verdict was reasonable. But the relevant question is not whether the available admissible evidence was enough to convict Scott; rather, the relevant question is whether there is a strong probability that no reasonable factfinder would have found Scott guilty of the offenses of assault, rape, and murder *if a DNA test result excluding Scott had been presented at trial and analyzed in the context of and upon consideration* of all available admissible evidence. *See* R.C. 2953.71(L). Here, the "margin of evidence," as the court of appeals describes it, significantly narrows when analyzed beside a presumed exclusion result. In other words, an exclusion result would create sufficient doubt

about key pieces of evidence in this case, demonstrating a strong probability that no reasonable juror would have found Scott guilty beyond a reasonable doubt.

{¶ 15} As the Twelfth District explained, "[t]he evidence underpinning Scott's conviction was based on eyewitness testimony and circumstantial evidence." 2020-Ohio-5302 at ¶ 47. The court of appeals noted that "Scott's conviction was not premised on the physical evidence recovered from Buckley's autopsy that Scott now seeks to test." *Id.* at ¶ 51. Both the trial court and the court of appeals gave significant weight to the eyewitness testimony of Tony Young, who testified at trial that he had observed Scott and Buckley engaging in a sexual act near the edge of the lake before Buckley's death. But the court of appeals also dismissed the two interviews that Young has since given in which he recanted his testimony—a 2009 interview with the Ohio Innocence Project and a 2015 interview with the Preble County Sheriff's Office. Despite noting that Young explained in those interviews that he had purposefully falsely identified Scott as the offender during his trial testimony, the Twelfth District concluded that Young's trial testimony "bore indicia of reliability" while "his recantations decades later lack[ed] credibility." 2020-Ohio-5302 at ¶ 27. But in those interviews, Young disclaimed ever having been at the party. This evidence, in addition to an exclusion result, would eliminate any remaining credibility of Young's trial testimony.

{¶ 16} An exclusion result would also significantly reduce the weight of other evidence that might have corroborated Young's false eyewitness testimony. For example, there was trial testimony that Scott and Buckley went missing from the party around the same time and that Scott returned to the party wet. But there was also testimony that approximately 60 to 120 people attended the party at the quarry. And Scott told investigators that he was wet because he had been pushed into the lake. An exclusion result, analyzed in the context of this evidence, would highlight the highly circumstantial nature of this testimonial evidence.

**{¶ 17}** The court of appeals also dismissed the weight of the evidence offered in support of Scott's defense theory that Buckley was killed by a member of the Johnson family. As the court of appeals noted, Ronnie Johnson was Buckley's abusive ex-boyfriend, and a witness testified that he saw Ronnie's car driving away from the party. *Id.* at ¶ 43, 46. The witness said he saw Ronnie's car leaving the lake just after Buckley's estimated time of death. As summarized by Scott in his memorandum in support of his application for postconviction DNA testing, at least eight people, including Buckley's parents, told investigators that either Ronnie or Lisa Johnson (Ronnie's cousin and Buckley's former friend) were likely suspects, given their past abuse of Buckley—Lisa had run over Buckley's foot after a public altercation in a parking lot—and given how fearful Buckley was of the Johnson family. According to Scott, three other people told investigators that Buckley also feared Ronnie's brothers, who had previously threatened her. None of the Johnsons were interviewed by investigators. At trial, Ronnie and Lisa each testified that they were at Ronnie's home on the evening of the murder.

**{¶ 18}** The court of appeals found that "there was no credible evidence of any involvement by the Johnsons in Buckley's death." 2020-Ohio-5302 at ¶ 46. But a DNA test result that excludes Scott, coupled with the information about the Johnsons discussed above, including the eyewitness testimony of Ronnie's car leaving the scene, bolsters the credibility of Scott's defense theory.

**{¶ 19}** The court of appeals also considered testimony from witnesses who heard Scott make inculpatory statements about Buckley's death. *Id.* at ¶ 28, 32. And the court of appeals found that Scott's ability to immediately identify Buckley upon finding her bloated and beaten body while swimming at the quarry the next day and his "apparent evidence destruction" (he tossed a red lighter like the one Buckley had owned and a red plastic cup like the one he had been drinking from at the party into the lake) after finding Buckley's body was circumstantial and probative evidence of Scott's involvement. *Id.* at ¶ 39-42.

10

**{¶ 20}** There is no question that Scott's behavior could be viewed as some evidence of his guilt, but we cannot conclude that it is sufficient on its own, particularly in light of a presumed exclusion result. The context of this evidence in the presence of a postconviction DNA test result that excludes Scott would cast doubt on the truth and overall impact of Scott's statements and actions.

**{¶ 21}** As the Twelfth District noted, circumstantial and direct evidence have the same probative value, and a sufficient "margin of evidence" may counter a conclusion that an exclusion result would be outcome determinative. 2020-Ohio-5302 at ¶ 47. But a presumed exclusion result viewed in the context of the circumstantial evidence described herein reduces the probative value of that "margin of evidence." Therefore, we conclude that the trial court and the court of appeals abused their discretion by unreasonably concluding that there is not a strong probability that a reasonable factfinder would have found Scott guilty if a DNA test result excluding Scott had been presented at trial.

**{¶ 22}** We do not reach this decision lightly. The horrible events leading to Buckley's death are not ones that her family and friends should have to relive so many years later. But the specter of a wrongful conviction in light of available but untested DNA evidence is something the legislature has sought to prevent by making postconviction testing available. *See* R.C. 2953.71 through 2953.84. And assurance that the public is protected because the actual offender is behind bars depends on the confidence of the conviction. To be clear, our decision is limited to Scott's application for postconviction DNA testing and should not be read as any commentary on whether Scott may be entitled to other postconviction relief aimed at overturning his conviction. In *Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, at ¶ 41, the Eighth District explained the risk that a defendant takes in seeking DNA testing:

[W]orth noting is the fact that additional [DNA] testing may not yield an inmate's expected results. In other words, testing can cut both ways for an applicant. Testing may, indeed, lead to the exoneration of one wrongfully convicted, but can also further implicate the inmate or simply have a neutral effect.

But the Eighth District also recognized:

The United States Supreme Court has stated that the "ultimate objective" of our system of criminal law is that "the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). If DNA testing has the proven ability to "exonerate[] wrongly convicted people," [*District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009),] we can perceive no viable argument that matters of judicial economy should supersede the law's never-ending quest to ensure that no innocent person be convicted.

(First brackets added in *Ayers*.) *Ayers* at ¶ 24.

{¶ 23} Under the circumstances of this case, we find that the trial court and the court of appeals abused their discretion by denying Scott's application for postconviction DNA testing.

### Conclusion

{¶ 24} For the foregoing reasons, we reverse the judgment of the Twelfth District Court of Appeals and remand the cause to the trial court with instructions that it accept Scott's application for postconviction DNA testing.

Judgment reversed

and cause remanded to the trial court.

DONNELLY, STEWART, and BRUNNER, JJ., concur.

FISCHER, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion joined by KENNEDY and FISCHER, JJ.

_____

**FISCHER, J., dissenting.**

{¶ 25} This case should be dismissed as improvidently allowed. It is questionable whether the proposition of law that this court resolves today was preserved in the lower courts. And as recognized by the second dissenting opinion, the second issue that the majority opinion resolves—whether a DNA exclusion result would be outcome determinative based on the trial evidence—was not a proposition of law that this court accepted for review. Because the court chooses to resolve that issue, I agree with the second dissenting opinion and join it in full.

{¶ 26} I also take this opportunity to encourage the General Assembly to review the statutory scheme at issue in this case and to make clear the requirements for approving an offender's application for postconviction DNA testing. After reviewing the statutory scheme, our precedent, and the decisions of the lower courts, it has become apparent that all participants in this litigation process have had difficulty interpreting the requirements set forth in R.C. 2953.71 through 2953.84. *See State v. Noling*, 153 Ohio St.3d 108, 2018-Ohio-795, 101 N.E.3d 435, ¶ 67 (this court read the statutory scheme in pari materia to understand the meaning of the phrase "results of the testing" as used in R.C. 2953.81(C)); *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124, paragraph one of the syllabus ("A careful, commonsense reading of R.C. 2953.74(C) in pari materia with R.C. 2953.72 and 2953.73 and the remainder of R.C. 2953.74 illustrates the intent of the General Assembly to authorize the trial court to exercise its discretion in how to proceed when ruling on an eligible inmate's application for DNA testing); *id.* at ¶ 39 (Harsha, J., concurring in judgment only) (the language of the statutory scheme

may seem plain when read in isolation, but it becomes ambiguous when read as a whole); *id.* at ¶ 42-45 (Lanzinger, J., dissenting) (disagreeing with the majority opinion's statutory reading on the ground that it conflicts with other mandatory language in the statute and creates and confers upon the trial court judicial discretion that does not exist in the statute). The statutory scheme may not be legally ambiguous, but there is always room for improvement.

_____

**DEWINE, J., dissenting.**

{¶ 27} We accepted the following proposition of law for review in this case:

In determining whether DNA testing would be outcome determinative, a trial court should consider the possibility that a DNA profile developed from crime scene evidence could match a profile contained within the [Combined DNA Index System ("CODIS")] database.

*See* 161 Ohio St.3d 1474, 2021-Ohio-717, 164 N.E.3d 482. The majority correctly rejects that proposition. That should end the case and dictate an affirmance of the Twelfth District Court of Appeals' judgment upholding the denial of Guy Billy Lee Scott's application for postconviction DNA testing.

{¶ 28} But, remarkably, that's not what the majority does. Instead, the majority goes beyond the case that was argued and briefed to us and—based on its theory of the trial evidence—grants the application for DNA testing. Incredibly, it does so *even though the trial evidence is not part of the record before us in this appeal*. I respectfully dissent.

14

**The majority correctly rejects Scott's argument in support of the proposition of law that was accepted for review**

{¶ 29} For a court to approve an application for postconviction DNA testing, the offender must show "that DNA exclusion when analyzed in the context of and upon consideration of *all available admissible evidence* related to the subject offender's case * * * would have been outcome determinative at that trial stage in that case." (Emphasis added.) R.C. 2953.74(B)(1); *see also* R.C. 2953.74(D) (directing the trial court to consider "all available admissible evidence related to the subject offender's case" when determining whether the outcome determinative criterion has been satisfied). A search of the CODIS database may or may not yield a match with another person's DNA profile. The mere possibility of a match does not constitute "available admissible evidence." It is hypothetical.

{¶ 30} By its terms, R.C. 2953.74(B)(1) requires the court to presume that DNA testing would lead to an exclusion result. R.C. 2953.71(G) defines an "exclusion result" as a DNA test result "that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question." If the applicant is excluded as a contributor to the DNA profile, the corollary is that the DNA belongs to someone else. Thus, by requiring the court to consider the effect of a test result excluding the applicant as a contributor to the DNA sample, the statute likewise requires the court to consider the effect of a test result that reveals a DNA profile belonging to someone other than the applicant.

{¶ 31} Scott asks this court to take an additional leap: he asks us to presume that the DNA profile identified through postconviction testing would conclusively match a profile contained in the CODIS database. The statute does not call for such a presumption. For those reasons, I agree with the majority's rejection of the proposition of law presented.

**The majority errs by going beyond the issue in front of us**

{¶ 32} The majority, though, does not limit itself to answering the proposition of law presented. It also concludes that the lower courts abused their discretion in determining that a DNA exclusion result would not be outcome determinative in this case. It therefore reverses the court of appeals' judgment and remands the case with instructions for the trial court to approve Scott's application for DNA testing. I am unable to join the majority's judgment in that regard for two reasons.

{¶ 33} First, that issue was not raised by Scott in this appeal or briefed by the parties. "It has long been the policy of this court not to address issues not raised by the parties." *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2, citing *F. Ents., Inc. v. Kentucky Fried Chicken Corp.*, 47 Ohio St.2d 154, 163, 351 N.E.2d 121 (1976). "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Natl. Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 148, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011), fn. 10, quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983). When we decide legal issues without the benefit of full briefing, we "run the risk of an improvident or ill-advised opinion, given the court's dependence on the adversarial process for sharpening the issues for decision." (Cleaned up.) *Carbino v. West*, 168 F.3d 32, 35 (Fed.Cir.1999).

{¶ 34} Indeed, Scott requested only that this court "remand the case with instructions to consider [his] eligibility for postconviction DNA testing under the proper standard." And the majority's decision in this case to reach an issue not raised or argued by Scott in his appeal to this court is especially unfair to the state, which has now had judgment entered against it on an issue that it did not expect to be considered and which it had no opportunity to brief or argue. *See id*.

16

**{¶ 35}** Even worse, the majority makes an evidentiary determination without all the evidence. The trial transcripts in this case are not part of our record. Not only is it necessary to review the trial transcripts before deciding whether a DNA exclusion result would be outcome determinative, it is also what is required by statute.

**{¶ 36}** R.C. 2953.73(D) says that when reviewing an application for postconviction DNA testing, the court "shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, *shall consider all the files and records pertaining to the proceedings against the applicant, including*, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and *the court reporter's transcript* and all responses to the application filed under division (C) of this section by a prosecuting attorney or the attorney general." (Emphasis added.) We simply don't have the portions of the record necessary to review the lower courts' determinations.

**{¶ 37}** As the appellant, it is Scott's burden to ensure that transcripts are part of the record on appeal. *See* App.R. 9(B); *see also Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980) ("When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm"). Indeed, this issue was brought to counsel's attention at oral argument, with one justice asking whether review of the transcripts would be necessary to decide this case. Scott's attorney responded that it was unnecessary for this court to review the transcripts to resolve the proposition of law presented. He reiterated that Scott was not seeking an order from this court directing that the application for postconviction DNA testing be granted; rather, he was asking only

for this court to remand the case to the lower courts so they could reconsider their conclusions under his proposed standard.

**{¶ 38}** The majority has now rejected Scott's proposed standard. No other issue is properly in front of us. The majority goes beyond its limited role and reaches an issue that is not before this court, and it makes an evidentiary determination without the benefit of having the trial evidence for review. I therefore dissent from its judgment reversing the court of appeals' judgment below.

KENNEDY and FISCHER, JJ., concur in the foregoing opinion.

_____

Martin P. Votel, Preble County Prosecuting Attorney, and Philip D. Bogdanoff, Special Assistant Prosecuting Attorney, for appellee.

Ohio Innocence Project, Donald R. Caster, Jennifer Paschen Bergeron, and Samantha M. Kovacevic, for appellant.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristen L. Sobieski, Assistant Prosecuting Attorney, urging affirmance for amicus curiae Ohio Prosecuting Attorneys Association.

Pillsbury Winthrop Shaw Pittman, L.L.P, Jeetander T. Dulani, Emily Huang, and Chloe J. Stepney; Timothy Young, Ohio Public Defender and Joanna Sanchez, Assistant Public Defender, urging reversal for amicus curiae the Innocence Network.

_____